Appellants’ Motion for En Banc Reconsideration Denied as Moot; Opinion
of June 7, 2011 Withdrawn; Affirmed, and Substitute Opinion filed August 25,
2011.

 

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-00780-CV

___________________

 

Harris County, Texas; G. Young; D. Gehring;
and J. Cavitt, Appellants

 

V.

 

Shirley Nagel, Individually and as
Representative of the Estate of Joel Don Casey, Appellee



 



 

On
Appeal from the 11th District Court

Harris County,
Texas



Trial Court Cause No. 2007-08301

 



 

 

SUBSTITUTE OPINION

            After
considering the appellants’ motion for en banc reconsideration, our judgment in
this case remains unchanged; however, to address the points raised in the
motion, we withdraw our opinion of June 7, 2011 and issue
this substitute opinion in its place.  We deny the motion as moot.  

            In this
civil-rights action, plaintiff Shirley Nagel, individually and as
representative of the estate of her son Joel Don Casey, sued Harris County and
members of the mental-health warrants division of the Precinct One Constable’s
office.  A jury found the County and three deputy constables liable for $3
million in damages.  The defendants ask us to reverse the judgment because the
deputies are entitled to qualified immunity, and because the evidence is
legally insufficient to sustain the judgment against the County.  Because the
record supports the conclusions that (a) the deputies are not entitled to
qualified immunity, and (b) Constable Jack Abercia ratified his deputies’ unconstitutional
use of excessive force, we affirm.  

I.  Background

            On Joel Don Casey’s 52nd birthday, deputy
constables from Harris County Precinct One arrived at the home he shared with
his mother, Shirley Nagel, to transport him to a psychiatric facility.  Because
Casey had thrown away the medication used to treat his schizophrenia and his
doctor had not returned Nagel’s repeated phone calls to request a replacement
prescription, Casey was to be hospitalized to have his medication stabilized.  Fifteen
minutes after deputies arrived at his home, Casey was dead.  Nagel’s evidence
and witnesses present a version of the events of those fifteen minutes that is
very different from that presented by the deputies and the County.  The jury
resolved these conflicts in Nagel’s favor, and in accordance with the standard
of review, we summarize the evidence in the light most favorable to the verdict.[1]

            Viewed in this light, the record shows that
Casey had been treated for schizophrenia for decades.  He lived nearly his
entire life with his mother, who knew that when he refused to take his
medication, his symptoms worsened.  Shortly before the Harris County Precinct
One Constable’s office became involved, Casey threw away his medication.  He
became worried that there were bombs in the home’s air vents, and he began
repeatedly rearranging the dishes.  

            In her attempts to have Casey’s
medication refilled, Nagel called Casey’s doctor every weekday from Friday,
February 11, 2005 through Thursday, February 17, 2005.  On Thursday, February
17, 2005, Anthony Green answered the doctor’s phone and said that he could not
refill Casey’s medication and that it sounded as though Casey needed to be
hospitalized to have his medication stabilized.[2] 
Green asked Nagel if Casey ever had been suicidal, and because Casey had been
suicidal decades earlier, Nagel answered in the affirmative.  Green told Nagel it
was too late to get a mental-health warrant that day, and instructed her to
call back the following morning and “a mental[-]health team from Harris County
Mental Health Association would come and escort [Casey] to the hospital.” 
Nagel did not know that law enforcement officers would execute the warrant.

            Nagel telephoned Green the next morning,
and he told her to wait outside for the mental-health team to arrive so she
could let them into the house.  That afternoon, Green applied for Casey’s
emergency detention.  To obtain the mental-health warrant, Green was required
to present evidence that Casey presented a substantial risk of serious harm to
himself or others.  In the warrant application, Green wrote that Casey was
having homicidal thoughts and had threatened his mother, but Nagel denies that
she said these things.  In a “rap sheet” Green prepared for the deputy
constables who would be assigned to execute the warrant, he again wrote that
Casey had homicidal thoughts and added that Nagel was afraid of her son;
however, he also wrote that Casey would not be violent or try to flee when the
officers arrived.  

            Sergeant Cindy Leija of the Harris County
Precinct One Constable’s office assigned deputies Gregory Young and Demonte
Gehring to execute the warrant.  Young called Nagel to confirm that Casey would
not fight them, and Nagel repeated that he would not.  She also informed Young
that police had escorted Casey to the hospital peacefully twice before.[3]

            When Young and Gehring arrived, Nagel met
them outside.  Gehring asked if Casey would give them any problems.  Nagel again
repeated that Casey would not be combative, but she noticed that Young already
had a taser in his hand while they were still outside the house.  As Young
later agreed at trial, he already had made up his mind about what he was going
to do before he ever saw Casey.

            The deputies knew that the area was safe before
they entered the house—so safe that they asked Casey’s mother to enter the
house first, even though she ambulated with the aid of a cane.  When they entered,
Casey was seated on the sofa with his feet on the coffee table; he was listening
to music and smoking a cigar.

            According to Nagel, Young immediately
shone the light from the taser on the middle of Casey’s forehead while Gehring
went around the back of the sofa to approach Casey from the other side.  Young and
Gehring did not identify themselves or state why they were in the house.  Young
only asked, “Are you Joel Don Casey?”  When Casey answered, “yes, sir,” Young
ordered him to stand up and place his hands behind his back.  Casey immediately
did so, and as Young later testified, Casey was showing no aggression. 
Nevertheless, Gehring grabbed Casey and began to handcuff him.  When Casey
flinched and said, “That hurts,” Gehring said “Hit him!”  Young shot Casey in
the chest with the darts from the taser, and Casey immediately dropped to his
knees with his face on the seat of the couch.  Gehring told Young to “hit him
again,” and although Casey said, “Please don’t kill me.  Please don’t shoot me
again,” Young shocked Casey with the taser approximately eighteen times.  At
some point, Young also radioed for assistance, but then radioed that additional
units should respond slowly.

            Young and Gehring next placed the
handcuffed Casey facedown on the floor.  According to Nagel, they grabbed Casey
under the arms and dragged him to the entryway of the house where they dropped
him.  Young then collected the wires from the taser darts while Gehring moved
the deputies’ car closer to the house.  When the deputies returned to Casey,
they again lifted him under his arms and told him to walk.  Casey fell, and the
deputies began hitting Casey’s head against the storm door of the house until
his mother opened the door.  Once outside, Young held Casey by the neck while
he and Gehring pushed Casey’s face against a brick wall.  Although Casey
repeated, “I am your friend.  I am your friend,” the two deputies raked Casey’s
face along the brick wall before placing him facedown on the ground near the deputies’
car.  They then began to “hogtie” Casey, fastening leg irons around his ankles
and using a chain 6–12 inches long to connect the leg irons to the handcuffs
behind Casey’s back.[4]

            At about this time, deputies Henry Thomas
and James Cavitt arrived, and Cavitt told the other deputies, “Relax, guys,
I’ve got it under control.”  While the four officers leaned their weight on
Casey’s back, Cavitt, who weighed approximately 250 pounds, placed his knee on
Casey’s neck.  Saying, “Bite me and you’ve had a bad day,” Cavitt pulled
Casey’s head backwards with such force that he broke the spinous processes from
one of the vertebrae in Casey’s neck and snapped a tendon on the side of his
neck.  As an expert in biomechanics later testified, the injuries to Casey’s
neck indicate that the deputies applied 740 pounds of compressive force.  Cavitt
continued to pull Casey’s head back as all four deputies leaned on Casey for approximately
three minutes while they finished hogtying him.  As this was happening, Nagel
saw the color drain from Casey’s face, and she told the deputies, “you have
just killed my son.”  Gehring said that Casey was fine, and the deputies pushed
Casey’s body—still hogtied—onto the backseat of the deputies’ car.  

            Once Casey was in the car, one of the
deputies noticed that Casey was not breathing.  They called emergency services,
and when the fire department responded, paramedics found that Casey was still
hogtied inside the vehicle, while the four deputies stood outside.  Because it
was impossible to perform CPR while Casey was in this position, paramedics
could not attempt to resuscitate him until he first was removed from the vehicle
and the various cuffs and chains were unlocked.  

            Attempts to revive Casey were
unsuccessful.  The Houston Police Department ruled his death a homicide, but no
charges were filed.  

            Acting for herself and as the
representative of Casey’s estate, Nagel sued the individual deputies and Harris
County, alleging that they caused Casey’s death by seizing him with excessive
force in violation of the Fourth Amendment.  See 42 U.S.C. § 1983. 
At trial, Nagel presented evidence that the deputies’ actions left Casey unable
to breathe and caused him to have a fatal heart attack.  An autopsy further revealed
abrasions to Casey’s forehead, nose, face, scalp, neck, shoulders, arms, chest,
abdomen, wrists, flanks, and knees; bruises to his head, neck, torso, and
extremities; hemorrhaging on his wrists, ankles, and lower back; more than a
dozen pattern burns from the taser; and the previously described fractures to
the back and side of his neck.  

            Medical examiner Dr. Mary Anzalone
testified that Casey’s heart attack was precipitated by the “physical process”
that the deputies employed.  This process included “everything that
occurred”—not only the extreme restraint and the pressure applied to Casey’s
back, but also “the blunt-force injuries on the body, the abrasions and the
bruises and the fractures . . . [and] the injuries that
occurred from the tasing.”  She testified, “Certainly if there was no physical
part of that process on that day, the death probably would not have occurred
that day.”  According to Dr. Anzalone, the following passage in Medicolegal
Investigation of Death illustrates the way in which Casey most probably died:

[P]inning down the shoulders
or forcibly pressing down the arms is equivalent to loading the back.  A
struggling, agitated individual breathes faster, has a faster heartbeat,
elevated blood pressure, and heightened metabolism.  Such an individual
requires more air and more oxygen.  Immobilization of the chest, even if only
partially reducing the ability to maintain vital functions, culminates in cardiac
arrhythmia.[5]

Dr. Werner Spitz similarly testified that Casey’s
weight placed him at a high risk of death from prone restraint with pressure
applied to his back, while the repeated shocks from the taser accelerated his
need for oxygen.  He explained that hogtying is not harmful unless weight is
applied to the body.  According to Dr. Spitz, “the neck and the loading him
down, they undoubtedly are what caused his death.”

            The deputies involved also testified
about the events surrounding Casey’s death, their training, and their awareness
of the risks of the methods they used.  Gehring stated that he did not learn
how to hogtie people while he was in the police academy, but was taught by his field-training
officer in the mental-health warrants division of the Harris County Precinct
One Constable’s office.  He agreed that Casey was under control after he was
handcuffed while the deputies were still in the house.  Gehring also knew when
he was restraining Casey that there was a risk that Casey could die.  

            Young
testified that he never was trained to hogtie anyone, and that he knew it could
be lethal.  It was his opinion that all of his actions were in accordance with
the customs, policies, practices, and procedures of the mental-health warrants
division.  Young and several other witnesses testified that although the Precinct
One Constable’s office had no written policies on hogtying, it was allowed in
practice.  

            Because Cavitt
is assigned to the patrol division, he did not address the training and
practices of the mental-health warrants division.  He agreed, however, that a
knee to the neck can cause death, and the use of deadly force on a person who already
was restrained by four officers would be excessive.

            The jury
found that (a) Gehring, Young, and Cavitt injured Casey through the use of
excessive force; (b) the deputies are not entitled to qualified immunity;
(c) the enforcement of a County policy or custom was the moving force
behind the violation of Casey’s constitutional rights; (d) the County
ratified the deputies’ conduct; (e) the County is liable for the
additional reasons that it failed to train and supervise the deputies in
executing mental-health warrants.  Based on these findings, the jury assessed
damages of $2.4 million for Nagel’s mental anguish and the loss of Casey’s
companionship.  An additional $600,000 was awarded to Casey’s estate for the
pain and mental anguish he suffered before his death.  The jury apportioned 97%
of the responsibility for the damages against the County, and found that
Gehring, Young, and Cavitt were each responsible for 1% of the damages.  The
jury did not award exemplary damages.

            The
defendants’ motion for new trial was overruled by operation of law, and they timely
filed this appeal. 

II.  Issues Presented

            Deputies Gehring,
Young, and Cavitt argue that this court should reverse the judgment against
them because Nagel failed to overcome their assertion of qualified immunity. 
According to the deputies, Nagel failed both to submit the issue to the jury
for a finding and to offer legally sufficient evidence to meet her burden of
proof.  

            Harris
County raises an additional seven issues challenging the trial court’s
judgment.  First, the County argues that the trial court erred in instructing
the jury that “Constable Abercia and the supervising deputy constables in the
chain of command are officials whose acts constitute final official policy of
Harris County with regard to the execution of mental[-]health warrants.”  In
its second issue, the County contends the evidence is legally insufficient to
support the jury’s finding that enforcement of a Harris County policy, custom,
or practice regarding the use of force in executing mental-health warrants was
a moving force in the alleged violation of Casey’s constitutional rights.  The
County asserts in its third and fourth issues that there is legally insufficient
evidence that the County ratified the use of excessive force, and thus, the
trial court erred in submitting ratification as a theory of recovery.  In its
fifth and sixth issues, the County challenges the legal sufficiency of the
evidence supporting the jury’s findings that the failure to train or to
supervise the deputies was a moving force behind the violation of Casey’s
constitutional rights.  In its final issue, the County argues that the trial
court erred in denying its motion for directed verdict at the close of all the
evidence.

III.  The
Deputies

            When a state
actor violates a person’s right to be free from the use of excessive force, a
suit for civil damages “may offer the only realistic avenue for vindication of
constitutional guarantees.”  Harlow v. Fitzgerald, 457 U.S. 800,
814, 102 S. Ct. 2727, 2736, 73 L. Ed. 2d 396 (1982).  On the other hand, there
is a risk that the fear of litigation and personal liability may “unduly
inhibit officials in the discharge of their duties.  Anderson v. Creighton,
483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987).  The
imposition of personal liability therefore “requires a careful balancing of
‘the nature and quality of the intrusion on the individual’s Fourth Amendment
interests’ against the countervailing governmental interests at stake.”  Graham
v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443
(1989) (quoting Tennessee v. Garner, 471 U.S. 1, 7–8, 105 S. Ct. 1694, 1699,
85 L. Ed. 2d 1 (1985)).  The Supreme Court has “accommodated these conflicting
concerns by generally providing government officials performing discretionary functions
with a qualified immunity, shielding them from civil damages liability as long
as their actions could reasonably have been thought consistent with the rights
they are alleged to have violated.”  Anderson, 483 U.S. at 638, 107 S.
Ct. at 3038.

To
determine whether to impose liability or to uphold an officer’s assertion of
qualified immunity, the test is one of objective reasonableness, without regard
to the officer’s intent.  Graham, 490 U.S. at 396, 397, 109 S. Ct. at
1872.  The challenged conduct is considered from the perspective of a hypothetical
reasonable officer who was on the scene at the time the force was used and
possessed the same information as the defendant officer.  Id. at 396,
397, 109 S. Ct. at 1872.  We then consider the officer’s conduct in light of
the clearly established law that would have been known to a reasonable person
at the time the force was used.  Harlow, 457 U.S. at 818, 102 S. Ct. at
2738.  In this way, the Court has allowed for reasonable mistakes, both of fact
and of law.  By evaluating the objective “factual” reasonableness from the view
of a reasonable officer with the same information, the Court recognized that
officers may have to make split-second decisions about the amount of force
needed in circumstances that are tense, uncertain, and rapidly evolving.  Graham,
490 U.S. at 396–97, 109 S. Ct. at 1872.  In describing the test for
objective “legal” reasonableness, the Court similarly has acknowledged that
reasonable people may have difficulty determining how even clearly established
law may apply to a particular set of circumstances.  See Brosseau v. Hagen,
543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) (per curiam)
(“Qualified immunity shields an officer from suit when she makes a decision
that, even if constitutionally deficient, reasonably misapprehends the law
governing the circumstances she confronted.”); Anderson, 483 U.S. at
641, 107 S. Ct. at 3039–40 (explaining that even though it is firmly
established that warrantless searches violate the Fourth Amendment if
unsupported by probable cause or exigent circumstances, officers can reasonably
but mistakenly conclude that probable cause or exigent circumstances are
present in the situation confronting them).

With
this understanding of qualified-immunity law, we turn to the deputies’ challenges
to the judgment.

A.        The
trial court did not abuse its discretion by defining the “objective
reasonableness” test for qualified immunity through an instruction in the jury
charge rather than including the definition in a specific interrogatory.

In
their first issue, the deputies ask us to reverse and render judgment that
Nagel take nothing because she failed to request and obtain a finding that, in
effect, the deputies were not entitled to qualified immunity.  When evaluating
an allegation of charge error, we must consider the entire charge.  See Island
Recreational Dev. Corp. v. Republic of Tex. Sav. Ass’n, 710 S.W.2d 551, 555
(Tex. 1986) (op. on reh’g).  Here, it is helpful to begin with the instructions
that preceded the challenged jury question.  

In the
portion of the jury charge that is relevant to this issue, the trial court
instructed the jury on the governing law as follows:

            The reasonableness of a particular use of force
must be judged from the perspective of a reasonable officer on the scene,
rather than with the 20/20 vision of hindsight.  The nature of reasonableness
must embody allowance for the fact that police officers are often forced to make
split-second judgments—in circumstances that are tense, uncertain, and rapidly
evolving—about the amount of force that is necessary in a particular situation.

            This reasonableness inquiry is an objective
one: the question is whether the officer[s’] actions are objectively reasonable
in light of the facts and circumstances confronting them, without regard to
their underlying intent or motivation. [[6]]

By these instructions, the trial court explained to
the jurors that the officers’ conduct must be objectively reasonable in a
factual sense.  

            The instructions continued as follows:

            If you find that the Plaintiff has proven her
claims, you must then consider the Defendants’ defense that their conduct was
objectively reasonable in light of the legal rules clearly established at the
time of the incident in issue and that the Defendants are therefore not liable.[[7]]

            Police officers are presumed to know about the
clearly established constitutional rights of citizens.  In February 2005, it
was clearly established law that citizens had a right to be free from excessive
force.

Thus, in this part of the instructions, the trial
court explained that the jury also must consider whether the officers’ use of
force was objectively reasonable in a legal sense.  

            The trial court concluded this section of
the instructions as follows:

            If, after considering the scope of discretion
and responsibility generally given to police officers in the performance of
their duties, and after considering all of the surrounding circumstances as
they would have reasonably appeared at the time of the arrest [sic], you find
from a preponderance of the evidence that Plaintiff has proved either (1) that
the Defendants were plainly incompetent or that (2) they knowingly violated the
law regarding Joel Casey’s constitutional rights, you must find for the
Plaintiff.  If, however, you find that the Defendants had a reasonable belief
that their actions did not violate the constitutional rights of Joel Casey,
then you cannot find them liable even if Joel Casey’s rights were in fact
violated as a result of the Defendants’ objectively reasonable action.

See Malley v. Briggs,
475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986) (explaining
that qualified immunity protects “all but the plainly incompetent or those who
knowingly violate the law”).  The deputies did not object to any of these
instructions in the trial court, and do not complain on appeal that these
instructions misstate the governing law.[8] 


            In the first
question of the charge, the jury was asked, “Did Joel Casey receive an injury
on February 18, 2005 which resulted from the use of force by any of the
officers named below which was excessive to the need and the excessiveness of
which was objectively unreasonable?”  The deputies and the County objected on
the ground that the jury was asked only whether there was a constitutional
violation, and not whether the deputies nevertheless were entitled to qualified
immunity.  They therefore asked the trial court to add the following words at the
end of Question One: “. . . and the use of which no reasonable officer who knew
the clearly established law and the surrounding circumstances could have
believed to be lawful.”  In the alternative, they asked the trial court to
submit a separate question on qualified immunity.[9]  

            The trial
court agreed with Nagel that the instructions adequately explained her burden
to overcome the assertion of qualified immunity, and therefore overruled the defendants’
objections and refused to submit their proposed question.  We review these rulings
for abuse of discretion, Holeman v. Landmark Chevrolet Corp., 989 S.W.2d
395, 397 (Tex. App.—Houston [14th Dist.] 1999, pet. denied), and will find such
abuse only if the trial court acted arbitrarily, unreasonably, or without
reference to guiding rules and principles.  Tex. Dep’t of Human Servs. v.
E.B., 802 S.W.2d 647, 649 (Tex. 1990); Downer v. Aquamarine Operators,
Inc., 701 S.W.2d 238, 241–42 (Tex. 1985).

According
to the deputies, the issue of qualified immunity was not presented to the jury
at all.  The instructions belie this contention.  Because the record does not
demonstrate otherwise, we presume that the jury followed these instructions.  See
Columbia Rio Grande Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 862 (Tex.
2009) (citing Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 771
(Tex. 2003)).  

The
jury could not answer Question One without first determining whether the
deputies’ use of force was “objectively unreasonable.”  The trial court included
detailed instructions explaining both the factual and legal components of the
objective-reasonableness inquiry.  Those instructions are separated from
Question One by a single paragraph defining and explaining the plaintiff’s
burden to prove causation.  Thus, the jury reached the first question only
after being expressly instructed to consider whether the deputies’ use of force
was “objectively reasonable in light of the facts and circumstances confronting
them,” and “objectively reasonable in light of the legal rules clearly
established at the time of the incident in issue.”

The
jury additionally was instructed that it could not find the
deputies liable if it concluded that the qualified-immunity standard was met. 
The trial court’s instruction provided, “If, however, you find that the
Defendants had a reasonable belief that their actions did not violate the constitutional
rights of Joel Casey, then you cannot find them liable even if Joel Casey’s
rights were in fact violated as a result of the Defendants’ objectively
reasonable action.”  This instruction covers the same ground as the deputies’
proposed addition at the end of Question One—and does so in a more
straightforward, easily understandable, and emphatic manner than adding the
phrase “. . . and the use of which no reasonable officer who knew the clearly
established law and the surrounding circumstances could have believed to be
lawful.”

            An analysis
of the trial court’s full instructions demonstrates that the deputies’ proposed
addition to Question One was not directed toward a different or additional
finding that otherwise was absent from the charge.  The deputies’ proposed
language merely restated the test for objective-reasonableness[10] by referring
again to a reasonable officer’s view of the “circumstances” and the “clearly
established law.”  Considering the question actually submitted to the jury in
light of the instructions in the charge, the deputies’ proposed changes to the
charge would have submitted a different shade of the same question or instruction. 
We therefore conclude that the trial court acted within its discretion by
refusing to include the deputies’ tendered language either as part of Question
One or in a separate question to the jury.  See Tex. R. Civ. P. 278 (“A judgment shall not be reversed
because of the failure to submit other and various phases or different shades
of the same question.”); cf. Dillard v. Tex. Elec. Coop., 157 S.W.3d
429, 433 (Tex. 2005) (“Because the instruction the trial court gave was
sufficiently broad to include all shades of [the defendant’s] inferential
rebuttal theories . . . , the trial court did not err in
rejecting [the defendant’s] additional request on this same issue.”).  We further
conclude that no harm can be demonstrated on this record even if it is assumed,
solely for the sake of argument, that the trial court exceeded its discretion
by addressing qualified immunity in the general instructions rather than
addressing it as an instruction added to Question One or as a separate
question.  See Tex. R. App.
P. 44.1  We accordingly overrule the deputies’ first issue.

B.        The
evidence is legally sufficient to overcome the deputies’ assertion of qualified
immunity.

            The deputies
seek reversal on the additional ground that Nagel failed to meet her burden to
overcome their assertion of qualified immunity.  To satisfy that burden, Nagel was
required to present legally sufficient evidence that Casey’s constitutional
rights were violated, and that the violation was objectively unreasonable.  See
McIntosh v. Partridge, 540 F.3d 315, 323 n.8 (5th Cir. 2008).  

            An officer’s
conduct is objectively unreasonable if it violates clearly established law of
which a reasonable officer would have been aware.  Anderson, 483 U.S. at
640, 107 S. Ct. at 3039.  The deputies assert that Nagel failed to show either that
the law violated was clearly established, or that a reasonable officer would
have been aware that such conduct was unconstitutional.  Specifically, the
deputies contend that Nagel failed to offer testimony (1) describing the
state of the clearly established law at the time of Casey’s death, and (2) identifying
beliefs that all reasonable officers would have held about the state of the law
at that time.  In particular, they contend that Michael Lyman, Nagel’s expert
witness on police procedures, did not discuss “constitutional standards under
the more specific facts in this case,” and that he did not address “what all
reasonable officers would have known about the law” at the time of these events. 
In other words, they complain that Lyman’s testimony was legally insufficient
to establish (1) the true state of the governing law and (2) the deputies’ lack
of an objectively reasonable, but mistaken, belief that their conduct was
constitutional.

1.                 
Identification of the clearly established law is not a
question of fact to be established by evidence.

In
arguing that Nagel failed to elicit testimony describing the state of the law
in February 2005, the deputies have assumed that the state of constitutional
law at a given time is a question of fact for the jury to decide based on the
evidence.  It is not.  Judges, not witnesses, determine the state of the
clearly established law.  See Littrell v. Franklin, Littrell
v. Franklin, 388 F.3d 578, 585 (8th Cir. 2004).  Consequently, Nagel was
not required to identify the clearly established law through evidence presented
to the jury.  

Moreover,
Nagel actually attempted to project cases overhead for the jury to read, and
the defendants’ counsel objected.  Curiously, the deputies argued that there
could be a question of fact in determining what law was clearly established at
a given time, but asserted that it would be a question of fact on which the
plaintiff could present no evidence.  In the ensuing discussion with the trial
court, their attorney represented that unless the trial court concluded that
the deputies were entitled to qualified immunity as a matter of law, then the
jury must decide the issue.  The trial court asked, “And then how is the jury
supposed to establish what clearly established law was at the time was [sic] in
order to answer the question?”  The deputies’ attorney answered, “Based on the
factual evidence.  They’re not supposed to be given cases and -- and testimony
about cases in front of them put up on the screen.”  But if the deputies’ view
of the law were correct—if the trial court’s only choice was to conclude either
that the clearly established law favored the officers or that it was a question
of fact on which the plaintiff could offer no evidence—then immunity would
apply in every case.  This would not be qualified immunity, but absolute
immunity.

            Here, the trial court advised jurors of
the state of the clearly established law by instructing them that “[i]n
February 2005, it was clearly established law that citizens had a right to be
free from excessive force.”  The deputies did not object to this instruction at
trial, and do not argue on appeal that this instruction is in any way
inadequate.  Cf. Anderson, 483 U.S. at 639–40, 107 S. Ct. at 3038–39.  Further,
they do not complain that there is insufficient evidence to support a finding
that they violated Casey’s “right to be free from excessive force,” as the
clearly established law was identified by the trial court.  Instead, they contend
Nagel failed to establish that no reasonable officer could have believed—even
mistakenly—that the force they used was constitutional.  We disagree.

2.         The
evidence is legally sufficient for a jury to conclude that no reasonable
officer would believe that the deputies’ conduct was constitutional.

            To determine
whether the evidence is legally sufficient to support the judgment, we review
the entire record, crediting favorable evidence if reasonable jurors could and
disregarding contrary evidence unless reasonable jurors could not.  City of
Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We assume that jurors
decided questions of credibility or conflicting evidence in favor of the
verdict if they reasonably could do so.  Id. at 819, 820.  We do not
substitute our judgment for that of the trier-of-fact if the evidence falls
within this zone of reasonable disagreement.  Id. at 822.  If the
evidence would enable reasonable and fair-minded people to differ in their
conclusions, then it is legally sufficient to support the verdict.  Id. 

            According to
the deputies, Nagel failed to prove that they were not simply mistaken about
the constitutionality of their actions.  In support of this argument, they
contend that Nagel’s police-procedures expert Michael Lyman did not identify the
range of reasonable officers’ beliefs about the state of the law in February
2005, but instead testified that the deputies’ actions did not comply with the
recommendations of the International Association of Chiefs of Police (“IACP”). 
It is true that Lyman frequently cited manuals and best-practices
recommendations published after the events at issue in this trial, and that
Nagel cannot overcome the deputies’ assertion of qualified immunity simply by
showing that they failed to follow a voluntary organization’s guidelines.[11]  Even officers’
violations of their own agency’s procedures or of state law generally are
insufficient to support an excessive-force claim.  Marquez v. City of Albuquerque,
399 F.3d 1216, 1222 (10th Cir. 2005).  

            But the relevant evidence consists of
more than just the testimony challenged by the deputies.  Lyman also accurately
testified that “an officer can only use that amount of force that is
objectively reasonable . . . .  And reasonable must mean
considering all the circumstances.”  See Graham, 490 U.S. at 396, 109 S.
Ct. at 1872.  He further explained that the reasonableness of an officer’s
conduct is evaluated objectively and without the benefit of hindsight by
measuring it against that of a reasonable officer who knew the same things the
defendant officers knew and was on the scene at the time.  See id. at
396–97, 109 S. Ct. at 1872.  Thus, Lyman correctly described the test, and applying
that test, he concluded that the deputies’ actions were not reasonable.  In
particular, he testified that it was not objectively reasonable for the
deputies to apply force or weight to Casey while he was restrained, and that
such conduct served no legitimate law-enforcement purpose.  He also stated that
a reasonable officer should know that when a 250-pound officer places his knee
on the neck and shoulder area of someone who is hogtied, there is a risk of
serious physical injury.  

            Moreover, it is not necessary in every
case that the plaintiff introduce expert testimony to identify beliefs about
constitutional law that reasonable officers could or could not have held at a
given time.  As the Seventh Court of Appeals has said, “[i]t would create
perverse incentives indeed if a qualified immunity defense could succeed
against those types of claims that have not previously arisen because the
behavior alleged is so egregious that no like case is on the books.”  McDonald
ex rel. McDonald v. Haskins, 966 F.2d 292, 295 (7th Cir. 1992) (holding
that despite absence of analogous case law, no reasonable officer could believe
it was constitutional to hold a gun to the head of an unarmed nine-year-old boy
and threaten to pull the trigger when the boy posed no threat to officers and
was not under arrest, suspected of a crime, attempting to flee, or interfering
in the officers’ search of his home).  

            We have found no case addressing all of
the uses of force at issue here—which include tightening handcuffs until they
left deep furrows in Casey’s wrists, shocking him with a taser approximately
eighteen times, dropping him at least twice, striking his head against a door
and a brick wall, hogtying him, and pulling his head and neck backwards while
applying 740 pounds of compressive force.  We nevertheless consider it
self-evident that, for example, no reasonable officer would believe that the
use of force Young describes below was constitutional: 

Q.        At
the time that we are talking about [i.e., after Young first shot Casey with the
darts from the taser], Joel Don Casey had his face down in the couch; isn’t
that right?

A:        Yes, sir, he did.

Q.        All
it would take was for you two officers to come over here and put your hands on
him and keep him in that position; isn’t that right?  That is one of your
options?

A.        In theory.

Q.        But you are continuing to taser him; isn’t that
true?

A.        I
continued to dry tase him because he wasn’t just standing still.  It wasn’t
like I was just dry tasing him.  He was letting me tase him.

. . .

Q.        You
are not telling this jury that it was a fight because a man is being shocked
with electricity that his body is involuntarily moving, are you?

A.        That is exactly what I am saying.

            No reasonable
officer could believe that the constitution permits a law enforcement officer
to use pain compliance measures to stop someone who is mentally ill from flinching
in response to electric shock.  This is easily derived from the general
constitutional rule, even without a prior case addressing this very topic.  See
United States v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227, 137 L.
Ed. 2d 432 (1997) (“‘The easiest cases don’t even arise.  There has never been . . . a
section 1983 case accusing welfare officials of selling foster children into
slavery; it does not follow that if such a case arose, the officials would be
immune from damages . . . .’” (quoting United States v. Lanier,
73 F.3d 1380, 1410 (6th Cir. 1996) (Daughtrey, J., dissenting))).  

            Moreover,
the jury watched a videotaped reenactment of Gehring, Young, Cavitt, and Thomas
restraining another deputy who was playing the part of Casey.  Because the
County prepared the reenactment, the deputies depicted their own versions of
their actions.  They did not repeatedly shock, drop, and strike the head of the
person playing the part of Casey; Cavitt did not place his knee directly on the
man’s neck; and of course, Casey’s role was played by someone who knew who the
other participants were, what they proposed to do, and why.  Despite these
advantages, the deputy playing Casey’s part was placed in so much pain that the
reenactment had to be aborted.  The jury was entitled to consider this fact
when evaluating what a reasonable officer on the scene could have believed
about the constitutionality of the force that the deputies used against Casey.

            Further, before
these events occurred, cases clearly established that officers use excessive
force if they apply significant pressure to a person who is hogtied.  See Champion
v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th Cir. 2004) (“[P]utting
substantial or significant pressure on a suspect’s back while that suspect is
in a face-down prone position after being subdued and/or incapacitated
constitutes excessive force.”); Simpson v. Hines, 903 F.2d 400, 402–03
(5th Cir. 1990) (affirming denial of qualified immunity to officers who subdued
detainee by putting an arm around his neck, lowering him to the floor, sitting
on his chest, then rolling him over and cuffing his hands and feet as he lay
prone); Johnson v. City of Cincinnati, 39 F. Supp. 2d 1013, 1019–20
(S.D. Ohio 1999) (finding that information existed in the law enforcement
community that put officers on notice of the dangers of positional
asphyxiation); Swans v. City of Lansing, 65 F.
Supp. 2d 625, 633–34 (W.D. Mich. 1998) (affirming verdict in favor of heirs of
mentally-ill arrestee who asphyxiated after officers restrained his hands and
legs behind his back to a strap around his waist and applied their weight to
him while he lay prone); Estate of Smith ex rel. Kirksey v. Pierce, No.
247154, 2004 WL 2951889, at *1, *4 (Mich. App. Dec. 21, 2004) (per curiam) (affirming
verdict against police officers for causing asphyxiation by restraining the
detainee, who was agitated and under the influence of cocaine, in a prone
position with his legs or feet held while a heavy officer leaned on his back
for ten to fifteen minutes), pet. denied, 706 N.W.2d 202 (Mich. 2005); cf.
Price v. San Diego, 990 F. Supp. 1230, 1239–40 (S.D. Calif. 1998)
(concluding that where plaintiffs offered no evidence of the amount of pressure
applied and no evidence that the pressure significantly affected arrestee’s
breathing, no excessive force was used by deputies who applied “incidental
pressure” rather than “significant pressure” to hogtied arrestee’s back).

            Lastly, there
is evidence that the deputies were aware that they were employing deadly force
against a person who not only was compliant, but who also was already restrained
so as to present no threat.[12] 
For example, Cavitt admitted he knew that if a 250-pound man used his knee to
deliver a blow to someone’s neck, the person could die.  Young testified that
if a 250-pound man dropped his knee one inch from the neck of a person who was
hogtied, it “probably would cause some damage” and “possibly” would break the
person’s neck.  Gehring admitted he knew that Casey could die from positional asphyxia
while he was hogtied and held down.  Young testified that he knew before these
events that hogtying could be lethal.  Captain Harry Cunningham admitted he had
known since 2002 or 2003 that there was a risk that a person so restrained
could die; and testified, “I think all of the officers were aware of that.”  

            For all of
these reasons, we conclude that the evidence is legally sufficient to support
the conclusion that no reasonable officer who was present when Casey was
detained could believe the deputies’ conduct was constitutional.  We therefore overrule
the deputies’ second issue and affirm the judgment against them.

IV.  The
County

            A
county can be held liable for constitutional torts caused either by (1) an
ordinance, regulation, policy, or decision promulgated and officially adopted
by the county’s officers, or (2) its unofficial customs and policies.  City
of St. Louis v. Praprotnik, 485 U.S. 112, 121, 108 S. Ct. 915, 923, 99 L. Ed.
2d 107 (1988) (plurality op.) (citing Monell v. Dep’t of Social Servs. of
N.Y., 436 U.S. 658, 690, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978)); Merritt
v. Harris County, 775 S.W.2d 17, 24 (Tex. App.—Houston [14th Dist.] 1989,
writ denied).  An official policy is one that has been adopted by the official
or officials responsible under state law for making policy in that area of the county’s
business.  See Praprotnik, 485 U.S. at 123, 108 S. Ct. at 924
(citing Pembaur v. City of Cincinnati, 475 U.S. 469, 482–83 & n.12, 106
S. Ct. 1292, 1299–1300 & n.12 (1986) (plurality op.)).  A custom or widespread
practice may form the basis of liability if the practice is so permanent and
well settled as to constitute a custom or usage with the force of law.  Adickes
v. S.H. Kress & Co., 398 U.S. 144, 167–68, 90 S. Ct. 1598, 1613–14, 26 L.
Ed. 2d 142 (1970).  

            The United States Supreme Court also has
recognized ratification as a basis for governmental liability as follows:    

[W]hen a subordinate’s decision is subject to review by the
municipality’s authorized policymakers, they have retained the authority to
measure the official’s conduct for conformance with their policies.  If the
authorized policymakers approve a subordinate’s decision and the basis for it,
their ratification would be chargeable to the municipality because their
decision is final.

Praprotnik, 485 U.S. at 127, 108 S. Ct. at
926.  Thus, unlike liability based on custom, ratification ultimately is based
on the conduct of the authorized policymaker, who in effect affirms that in
performing the challenged conduct, the employee was executing official policy. 


            Only
officials who have “final policymaking authority” may subject the government to
liability.  See id. at 123, 108 S. Ct. at 924 (citing Pembaur,
475 U.S. at 483, 106 S. Ct. at 1300).  The issue of whether a particular
official has “final policymaking authority” is a question of state law, which may
include valid local ordinances and regulations.  Id. at 123, 125, 108 S.
Ct. at 924, 925 (citing Pembaur, 475 U.S. at 483, 106 S. Ct. at 1300).  

            Here, the
jury found (a) the enforcement of a County policy or custom was the moving
force behind the violation of Casey’s constitutional rights, (b) the
County was liable for the additional reasons that it failed to train and
supervise the deputies in executing mental-health warrants, and (c) the
County ratified the deputies’ conduct.  Because we find the ratification issue
dispositive, we address only that point.  See Tex. R. App. P. 47.1.

A.        It is unnecessary—and
impossible—to prove that a constitutional violation was caused by its
ratification.

            In the fourth question of the charge, the trial
court asked the jury if the County ratified the deputies’ use of excessive
force against Casey.  The following instruction accompanied this question:

You
are instructed that Harris County ratified the conduct of the officers only if
you find by a preponderance of the evidence that the Harris County Precinct One
Constable final policymaker reviewed the events of February 18, 2005, knew the
force used by officers was clearly excessive to the need and agreed with the
officers’ illegal conduct by not imposing discipline.  You may find Harris
County responsible if you find that the deputies’ decisions that you found were
unconstitutional in Question No. 1 were subject to review by the county’s
authorized policymakers and the authorized policymakers approved the deputies’
decisions and the basis for them.  You are instructed that Harris County is not
liable under a ratification theory if you find it merely approved the officers’
conduct without knowing the basis for it, or merely failed to investigate the
facts.  

 

            The County objected to the submission of a
ratification question on the ground that there was no evidence of ratification,
and more specifically, that “an after the fact ratification of a completed
constitutional violation can never be the moving force behind that violation.” 
In its appellate brief, the County argued that the trial court erred in
overruling those objections and that the evidence was legally insufficient to
support the jury’s affirmative finding.

            In referring to “the moving
force,” the County was alluding to the Supreme Court’s language in Monell explaining
that a governmental entity is liable for its employee’s use of excessive force only
if the employee’s execution of official policy caused the violation of
constitutional rights.  See Monell, 436 U.S. at 694, 98 S. Ct. at
2037–38 (holding government liable because the case “involves official policy
as the moving force of the constitutional violation”).  This requirement is
necessary because governmental entities cannot be held vicariously liable under
§ 1983 for violation of the constitutional right to be free from the use
of excessive force.  Id. at 691–92, 98 S. Ct. at 2036.  Absent proof of
causation, there is a danger that the governmental entity will be held liable
for the claimant’s injuries solely because it employed the actor who actually
violated the claimant’s constitutional rights.  See id. at 694, 98 S.
Ct. at 2037–38; Bd. of Cnty. Comm’rs v. Brown, 520 U.S. 397, 408, 117 S.
Ct. 1382, 1390, 137 L. Ed. 2d 626 (1997).  

            In a purely semantic sense, the County is partially
correct: an effect cannot precede its cause.  No constitutional violation could
be caused by its ratification, because by definition, ratification can occur
only after the act that is ratified.  See, e.g., Bocanegra v. Aetna
Life Ins. Co., 605 S.W.2d 848, 851 (Tex. 1980) (“A ratification rests upon
a manifestation of assent to confirm one’s prior act or that of another.”)
(emphasis added); Avary v. Bank of Am., N.A., 72 S.W.3d 779, 788 (Tex.
App.—Dallas 2002, pet. denied) (“Ratification is the adoption or confirmation
by a person, with knowledge of all material facts, of a prior act that
did not then legally bind that person and which that person had the right to
repudiate.”) (emphasis added).  Thus, it is impossible for a later ratification
to cause an earlier constitutional violation.  Consequently, if ratification gave
rise to municipal liability only when it was the cause-in-fact of the
constitutional violation, then municipal liability never could be based on
ratification.  

            The County argues that governmental liability
based on ratification is subject to a restriction not mentioned in Praprotnik,
i.e., that ratification is possible only if the act to be ratified has not yet
been completed.  In support of this argument, the County relies on Thomas ex
rel. Thomas v. Roberts, 261 F.3d 1160, 1174 (11th Cir. 2001), vacated,
536 U.S. 953, 122 S. Ct. 2653, 153 L. Ed. 2d 829 (2002), reinstated with
supp. op., 323 F.3d 950 (11th Cir. 2003).  In that case, a fifth-grade
student reported to his teacher that an envelope of cash he had placed on the
teacher’s desk was missing.  Id. at 1163.  Without individualized
suspicion that any particular child had taken the money, school district
personnel strip-searched the boy’s classmates.  Id. at 1163–64.  The
Eleventh Circuit Court of Appeals reversed the judgment against the school district
because “the clear import of Praprotnik is that a local government may
be held liable for a constitutional tort when policymakers have had the
opportunity to review subordinates’ decisions before they become final.”  Id.
at 1174.  Because the search was over before the district had an
opportunity to review the decision to strip-search the children, the court
concluded that the district could not have ratified the decision.  Id. at
1174–75.

            We agree that when a subordinate decides to
engage in unconstitutional conduct and the final policymaker reviews and
approves that decision before it becomes final, then the governmental entity is
liable.  See Praprotnik, 485 U.S. at 127, 108 S. Ct. at 926.  But that
is not because the policymaker ratified the subordinate’s conduct; it is because
the final act was authorized by the final policymaker.  When the policymaker authorizes
the violation of constitutional rights, causation is straightforward.  See
Brown, 520 U.S. at 406, 117 S. Ct. at 1389.  In such a case, proof
that the policymaker made such a decision is sufficient to prove causation.  Id.
at 405–06, 117 S. Ct. at 1389.  This is true even if the policy is not one
of general application, but instead was the policymaker’s decision in a single
specific case.  See, e.g., City of Newport v. Fact Concerts, Inc.,
453 U.S. 247, 252, 101 S. Ct. 2748, 2752, 69 L. Ed. 2d 616 (1981) (city council
voted to cancel license for concert); Owen v. City of Independence, 445
U.S. 622, 629, 100 S. Ct. 1398, 1404, 63 L. Ed. 2d 673 (1980) (city council
censured and discharged an employee without a hearing).  

            In a practical sense, however, there is no
difference between prior authorization and subsequent ratification.  Gernetzke
v. Kenosh Unified Sch. Dist. No. 1, 274 F.3d 464, 469 (7th Cir. 2001).  “[R]atification is ‘the equivalent of authorization,
but it occurs after the fact . . . .’”  ABN AMRO, Inc.
v. Capital Int’l Ltd., 595 F. Supp. 2d 805, 822 (N.D. Ill. 2008) (quoting Progress
Printing Corp. v. Jane Byrne Political Comm., 601 N.E.2d 1055, 1067 (Ill. App. 1992); see also Restatement (Third) of Agency
§ 4.01(1) (2006) (“Ratification is the affirmance of a prior act done by
another, whereby the act is given effect as if done by an agent acting with
actual authority.”) (emphasis added); Restatement (Second) of Agency, § 82 (1958) (“Ratification
is the affirmance by a person of a prior act which did not bind him but which
was done or professedly done on his account, whereby the act, as to some or all
persons, is given effect as if originally authorized by him.”) (emphasis
added).  And as previously mentioned, causation can be inferred from
authorization.  Brown, 520 U.S. at 405–06, 117 S. Ct. at 1389.  Thus, if the official policymaker ratified the
subordinate’s conduct, the factfinder can treat the action as directly
authorized or performed by the policymaker and infer that the execution of official
policy caused the constitutional violation.  See Santibanes v. City of
Tomball, 654 F. Supp. 2d 593, 614 (S.D. Tex. 2009) (describing the
plaintiff’s ratification theory of liability as one in which official policy is
alleged to have caused the deprivation of constitutional rights).  

            Although we decide
this issue under federal law, our own state’s treatment of ratification in another
context illustrates the same tenet.  Under Texas law, for example, a principal who
ratifies its agent’s criminal act is liable for exemplary damages just as
though it authorized the act in advance.  Compare Tex. Civ. Prac. & Rem. Code Ann.
§ 41.005(c)(1) (West 2008) (authorization) with id. § 41.005(c)(4)
(ratification).[13]  A principal who ratifies its agent’s act is directly
culpable, Shearson Lehman Hutton, Inc. v. Tucker, 806 S.W.2d 914, 925
(Tex. App.—Corpus Christi 1991, writ dism’d w.o.j.), because an act that has
been ratified is “directly attributable” to the principal.  Mobil Oil
Corp. v. Ellender, 968 S.W.2d 917, 921–22 (Tex. 1998).  

            In effect, then,
the County’s objection that “an after the fact ratification of a completed
constitutional violation can never be the moving force behind that violation” is no different from an objection that “advance
authorization to commit a constitutional violation can never be the moving
force behind that violation.”  This is incorrect; a governmental entity’s
advance authorization of a constitutional violation can be the moving force
behind the violation.  See Pembaur, 475 U.S. at 481, 106 S. Ct. at
1299.  Thus, the trial court did not abuse its discretion in overruling the
deputies’ objection. 

B.        The evidence is
legally sufficient to support the jury’s finding of ratification.

            Because the County
did not object to the instruction that accompanied the ratification question,
we measure the legal sufficiency of the evidence in light of that instruction. 
See Larson v. Cook Consultants, Inc., 690 S.W.2d 567, 568 (Tex. 1985).[14]  As charged, the jury could find ratification if
there was legally sufficient evidence that the final policymaker for the Harris
County Precinct One Constable’s Office (1) reviewed the events of February 18,
2005; (2) knew the force used by the officers was clearly excessive to the
need; and (3) did not discipline the deputies for their conduct.  The jury
also was instructed it could find that the County ratified the deputies’
decisions to use excessive force if the County’s authorized policymakers
approved the deputies’ decisions and the basis for them.

            Only an official “responsible under state law for making
policy in that area of the [governmental entity’s] business” can subject
a governmental unit to § 1983 liability.  Praprotnik, 485 U.S. at
123, 108 S. Ct. at 924 (emphasis in original) (citing Pembaur, 475 U.S. at
482–83 & n.12, 106 S. Ct. at 1298–300 & n.12).  Thus, to determine
whether the County ratified the deputies’ decisions, the jury had to begin its
analysis by considering the actions and knowledge of those responsible for
making final official policy as to the way in which deputies execute
mental-health warrants.  

            It is the trial court’s responsibility to
identify for the jury, as a matter of state law, those officials who “speak
with final policymaking authority” for the defendant governmental entity
concerning the action that allegedly caused a violation of constitutional
rights.  Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S. Ct.
2702, 2724, 105 L. Ed. 2d 598 (1989).  Here, neither the general instructions
of the jury charge nor the instruction accompanying the ratification question
identified the relevant final policymaker, and the County presented no objection
in the trial court or argument in its appellate brief about the omission.  

1.         The
County’s objection to an instruction accompanying a different question does not
apply by implication to the instructions accompanying the ratification question.

            In an instruction to a different
question, the trial court defined the “officials whose acts constitute the
County’s final official policy” in the execution of mental-health warrants to
include everyone in the chain of command.  The County objected to that
identification, but did not object to the absence of a instruction identifying
the policymaker referred to in the ratification question.  After we issued our
original opinion in this case, the County moved for en banc reconsideration and
argued for the first time that its objection to the instruction accompanying an
earlier question in the charge applied to the ratification question.  For several
reasons, that argument does not affect our analysis.  

            First, this contention was raised for the
first time in the motion for en banc reconsideration.  We generally do not base
our rulings on arguments that were raised for the first time in a motion for
rehearing.  See AVCO Corp. v. Interstate Sw., Ltd., 251 S.W.3d 632, 676
(Tex. App.—Houston [14th Dist.] 2007, pet. denied) (supp. op. on reh’g).  

            Second, the Texas Rules of Civil
Procedure specifically provide that “[n]o objection to one part of the charge
may be adopted and applied to any other part of the charge by reference only.” 
Tex. R. Civ. P. 274.  Here, the
County did not direct the trial court’s attention to its earlier objection at
all, and we decline to hold that silence suffices where an overt reference would
not.  

            Third, the County’s objection that an earlier instruction
identified the wrong policymaker does not apply to an instruction that does not
identify the policymaker at all.  In the preceding question in the charge, the
jury was asked if “Harris County Precinct One Constable’s enforcement of a
Harris County policy, custom or practice regarding the use of force” in
executing mental-health warrants was “a moving force of a violation” of Casey’s
constitutional rights.  An accompanying instruction provided that “Harris
County Precinct One Constable Abercia and the supervising deputy constables in
the chain of command of the Harris County Precinct One mental[-]health warrant
division are officials whose acts constitute final official policy of Harris
County with regard to the execution of mental[-]health warrants.”  The County
objected “because the accompanying instruction is incorrect as a matter of
law.  Neither Constable Abercia nor any supervising deputy constables are final
policymakers for Harris County.”  In contrast, the instruction accompanying the
ratification question refers to “the Harris County Precinct One Constable final
policymaker” and to “the county’s authorized policymakers,” but does not define
either term.  Thus, even if the County could adopt its earlier objection by
reference (which it cannot), and even if it had referred the trial court to its
earlier objection (which it did not), the objection would have been
inapplicable.  

            Fourth, the County reasons that because
references to the policymaker are undefined in the instruction accompanying the
ratification question, the jury would have relied on the instruction in the
preceding question, but the County ignores a later question in which
“policymaker” is used differently.  In the question submitting Nagel’s
failure-to-train theory of municipal liability, “policymaker” is used to refer
to Abercia alone.  The County did not object that the policymaker was
incorrectly identified in this part of the charge and does not explain its
assumption that jurors would believe that any reference to a “policymaker”
included the entire Precinct One chain of command (consistent with the
instructions to Question Three) and not Abercia alone (consistent with the
instructions to Question Six).[15]

2.         As a
matter of law, Constable Abercia was Harris County’s final policymaker
concerning the manner in which mental-health warrants were executed.  

            In its motion
for en banc reconsideration, the County also made two additional but
contradictory arguments.  First, the County treated identification of the final
policymaker as a question of fact, and asserted that the record was “[w]ithout
evidence of a policymaker.”  The County nevertheless acknowledged that
“Constable Abercia responded affirmatively to a question asking whether he was
the “‘ultimate policymaker.’”  To avoid this testimony (to which no objection
was made at trial), the County then reversed its position and argued that
“whether an official is a final policymaker is a question of law and Constable
Abercia’s legal opinion on the subject is irrelevant.”[16]  Given the
apparent confusion about how a “final policymaker” is identified, we address
the County’s arguments and the governing law in greater detail.

            On appeal, the County does not identify any
person or entity as its final policymaker concerning the manner in which
mental-health warrants are executed, but instead argues only that Abercia and
the deputy constables are not policymakers.  In particular, the County contends
that under binding precedent from this court, a constable is not a final
policymaker for the purposes of § 1983 liability.  In support of this
contention, the County relies on Merritt v. Harris County, 775 S.W.2d 17
(Tex. App.—Houston [14th Dist.] 1989, writ denied).

            In Merritt, the appellants
complained that after deputy constables executed a writ of restitution (now known
as a writ of possession)[17]
evicting them from their homes, the appellants’ property was sent to a private
warehouseman who either charged excessive fees or did not allow the appellants
to redeem the property at all.  Id. at 21.  We wrote that “[u]nder Texas law, Harris County Constables are not
policymaking officials of county government when performing their narrowly
circumscribed duty to execute a writ of restitution.”  Id. at 24
(emphasis added).  But, as previously discussed, the person or entity capable
of subjecting the government to Monell liability must be an official or
body “responsible under state law for making policy in that area of the
[governmental entity’s] business.”  Praprotnik, 485 U.S. at 123, 108 S.
Ct. at 924 (emphasis in original) (citing Pembaur, 475 U.S. at 482–83
& n.12, 106 S. Ct. at 1298–300 & n.12).  Merritt does not apply
here, because the area of the county’s business at issue in that case was
the disposition of property removed in the course of executing a writ of restitution,
whereas the area of the county’s business at issue here is the manner in
which mental-health warrants are executed.  These are different areas of the
County’s business, and the final policymaker is not necessarily the same in
both areas.  See Pembaur, 475 U.S. at 483, 106 S. Ct. at 1300
(“[M]unicipalities often spread policymaking authority among various officers
and official bodies.  As a result, particular officers may have authority to
establish binding county policy respecting particular matters and to adjust
that policy for the county in changing circumstances.”).  Moreover, we
concluded in Merritt that the complained-of misconduct did not
occur until after the writ was executed, and even then, any misconduct was
performed by a private person over whom the constable and deputies exercised no
control.  Id. at 23.  Because we held that there was no constitutional
violation by a person or entity acting under color of state law, the question
of who makes policy for the execution of writs of restitution was not before us. 
See id. at 24.  Thus, the entire
discussion in Merritt concerning the identification of the relevant
policymaker is dicta.  

            Although the County has consistently
maintained that, as a matter of law, neither a constable nor a deputy constable
can be a final policymaker for the County, that contention is only partially
correct.  Deputies and constables differ
significantly in their authority to make and enforce policy.  A deputy is an
at-will employee[18]
appointed by the constable.  Tex.
Loc. Gov’t Code Ann. § 151.001 (West 2008). 
As such, a Harris County deputy constable’s actions are subject to review by
the constable, and the constable can terminate the employment of a deputy whose
actions do not conform to departmental policy.  See, e.g., Harris
County v. Vernagallo, 181 S.W.3d 17, 20–22, 29 (Tex. App.—Houston [14th
Dist.] 2005, pet. denied) (reversing and rendering judgment that deputy
constable take nothing by his wrongful-termination suit where constable fired
deputy for violating departmental policy).  As a matter of state law, a deputy
constable is not a final policymaker, because by statute, “[t]he constable is
responsible for the official acts of each deputy of the constable.”  Tex. Loc. Gov’t Code Ann.
§ 86.011(c) (West 2008).  

            In
contrast, a constable, like a justice of the peace or a county commissioner, is
a county officer elected on a precinct-wide basis.  Compare Tex. Const. art. V, § 18(a) (providing
for election of constables and justices of the peace by precinct) with id. art.
V, § 18(b) (providing for election of commissioners by precinct) and
id., art. V, § 24 (setting forth the conditions for removing from
office “County Judges, county attorneys, clerks of the District and County
Courts, justices of the peace, constables, and other county officers”)
(emphasis added).  The constable is not subject to discipline, and the
constable’s actions are not reviewable for conformance to policy.  See Tex. Const. art. V, § 24; Tex. Loc. Gov’t Code Ann. § 87.013. 
Unlike a deputy, a constable can be removed from office only “for incompetency,
official misconduct, habitual drunkenness, or other causes defined by law, upon
the cause therefor being set forth in writing and the finding of its truth by a
jury.”  See Tex. Const.
art. V, § 24; Tex. Loc. Gov’t Code
Ann. § 87.013.

            Although the county commissioners court
exercises “such powers and jurisdiction over all county business” conferred on
it by the state constitution or state law, Tex. Const.
art. V, § 18(b), the parties have not cited, and we have not found,
any legislation, ordinance, or similar enactment authorizing it to set the
policies governing the way in which the deputy constables of a given precinct
execute mental-health warrants.  Cf. Brady v. Fort Bend County, 145 F.3d
691, 700, 702 (5th Cir. 1998) (explaining that when Texas law allows no other
official or governmental entity to exert control over a county elected
official’s discretion, the elected official is the final policymaker in that
area of the county’s business).  Only the constable
has supervisory authority over the deputy constables; the commissioners court’s
only authority over the deputies is budgetary.  See Renken v. Harris County,
808 S.W.2d 222, 225–26 (Tex. App.—Houston [14th Dist.] 1991, no writ).  The
constable applies to the commissioners court for the authority to appoint
employees, and in populous counties such as Harris County, the constable also
must describe the duties that these employees will perform.  Tex. Loc. Gov’t Code Ann.
§ 151.001.  The commissioners court then allocates the funds to pay the
constable and employees.  See Tex.
Const. art. XVI, § 61; Tex. Loc.
Gov’t Code Ann. §§ 151.001, 152.001.  It approves the number of
deputies the constable may appoint, Tex.
Loc. Gov’t Code Ann. § 151.002, but not the individual
appointments.  Id. § 151.003.  It has no
authority to appoint or terminate deputy constables.  Id.  The
commissioners court can choose to allocate all of the funds for serving
mental-health warrants to a single precinct constable’s office, or to transfer
all such funds—and the accompanying responsibility—to another official
authorized to execute such warrants.  Cf. Griffin v. Birkman, 266 S.W.3d
189, 193, 201–03 (Tex. App.—Austin 2008, pet. denied) (commissioners court
first gave funds and responsibility for executing mental-health warrants to the
constable of a single precinct, then transferred the funds and responsibility
to the sheriff).  

            Where the commissioners court allocates
all such funds and responsibility to a single precinct constable’s office, that
constable can be said to represent the county in that particular area of the
county’s business.  This is so because the identification of the final
policymaker in a given area is a matter of state law, “which may include valid
local ordinances and regulations.”  Praprotnik, 485 U.S. at 124–25, 108
S. Ct. at 924–25.  The “authority to make municipal policy may be granted
directly by a legislative enactment,” Pembaur, 475 U.S. at 483, 106 S.
Ct. at 1300, but policymaking power does not belong exclusively to the
legislature.  Id. at 480, 106 S. Ct. at 1298–99.  

            Under Texas law, the principal organ of
county government is the commissioners court.  Comm’rs Court of Titus County
v. Agan, 940 S.W.2d 77, 79 (Tex. 1997) (citing Tex. Const. art. V, § 1).  Its powers and duties “include
aspects of legislative, executive, administrative, and judicial functions.”  Id. 
In creating the county budget, the commissioners court performs a
legislative function.  Griffin, 266 S.W.3d at 194–95.  The allocation of
county funds is a policymaking determination.  Hooten v. Enriquez, 863
S.W.2d 522, 529 (Tex. App.—El Paso 1993, no writ).  And in adopting a budget in
which all of the County’s funds for the service of mental-health warrants were
allocated to the Harris County Precinct One Constable’s office, the County effectively
designated the constable of that precinct as the final official policymaker
concerning the manner in which those warrants were served.  

            As Abercia testified, the Precinct One
Constable’s office has sought and received responsibility and funding for the
execution of all of the mental-health warrants in Harris County since the early
1970’s.  He further affirmed that, should such warrants be issued initially to another
precinct or to the police or sheriff’s department, the warrants are routed to
the Precinct One Constable’s office for execution.  Moreover, the County conceded in its appellate brief that the Precinct
One Constable’s office executes all of the mental-health warrants in Harris
County.  See Tex. R. App.
P. 38.1(g).  And as we have shown, the constable is the only official who has
supervisory authority over the deputies and is responsible for their official
conduct as a matter of state law.  Thus, at all relevant times, Abercia has
been the final policymaker concerning the manner in which mental-health
warrants are executed in Harris County.[19]  Although we measure the sufficiency of the
evidence against the charge given, we need not consider whether a rational jury
so charged could have found that anyone else ratified the deputies’ decisions
if the evidence is legally sufficient for the jury to conclude that Abercia did
so.  

3.         A rational jury
could have concluded that Abercia ratified the deputies’ decision to use
excessive force. 

            We must sustain the jury’s ratification finding
if, after reviewing all of the evidence in the light most favorable to the
verdict, we conclude that a rational jury could have found that Abercia either approved
the deputies’ decisions and the basis for them, or (a) reviewed the events that occurred on the day of Casey’s death, (b) knew
that the deputies used excessive force, and (c) did not discipline the deputies
for their conduct.  The evidence is sufficient under either formulation.  

            First, there
is legally sufficient evidence that Abercia reviewed the events surrounding
Casey’s death.  In particular, Abercia testified that before speaking with his
second-in-command, Chief Michael Butler, and Butler’s subordinate, Captain Harry
Cunningham, Abercia independently investigated the events of February 18,
2005.  As Abercia stated, “I’ve been in that office 38 and a half years, so I’m
well-versed on what can be right and what can be wrong.”  According to Abercia,
his own review was sufficient to allow him to determine if the deputies did
anything wrong.  We acknowledge that Abercia made many other statements that cannot
be reconciled with this statement.  For example, Abercia also testified, “I can
only tell you what I’m told,” and stated that he did not speak to any of the
eyewitnesses; did not read Nagel’s statement; did not read any of the deputies’
reports of the incident; did not review the autopsy report; did not know how
many times Casey was shocked with the taser; did not know what restraints were
used; did not know that Casey was hogtied; did not know that deputies in the
mental-health warrants division routinely receive field-training in hogtying;
did not know that one of the deputies involved in this incident placed his knee
on Casey’s neck; did not know what injuries Casey received; did not know
Casey’s cause of death; and did not know that Casey’s death was determined to
be a homicide.  In accordance with the legal-sufficiency standard of review, however,
we presume that the jury resolved conflicts in the evidence in a manner that
supports the verdict.  

            The evidence also is legally sufficient to allow
a reasonable jury to conclude that Abercia knew the force used was clearly
excessive to the need, but did not discipline the deputies.  Abercia stated
that leg restraints of the type used to restrain Casey are “very dangerous,”
and he agreed that hogtying—which he described as “[b]uckling them down where
they can’t move anywhere” and “they can’t move their legs or arms
independent[ly]”—is “abusive.”  It is beyond dispute, however, that this is what
the deputies did to Casey.  

            Abercia also agreed that if his subordinates
engaged in a practice he thought was dangerous or wrong, he would stop it.  He
nevertheless testified, “I didn’t see anything that I could pinpoint as being
wrong because we run into similar to this almost every day.”  And
significantly, he agreed that his deputies “can just keep carrying on out there
handling mentally-ill medical patients the same way they have in this case.”  

            Concealment also can support an inference that
the constitutional violation was officially approved.  See, e.g., Marchese
v. Lucas, 758 F.2d 181, 187–88 (6th Cir. 1985); Webster v. City of Houston, 689
F.2d 1220, 1227 (5th Cir. Tex. 1982).  Here, there is ample evidence from which
a reasonable jury could conclude that there was a concerted effort to conceal
the extent of the force used against Casey.  Chief Butler testified that
Abercia told him not to investigate the deputies’ conduct, but to leave the
investigation to the Houston Police Department.  As Butler stated, “The
Constable is of the opinion that if it’s an independent investigation to clear
his officers, then that’s good enough for him.”  In accordance with Abercia’s
directives, his subordinates “have to stand down and do what the Constable has
instructed us to do.”  Butler therefore did not review relevant evidence,
because, as he explained, “My focus was to make sure that the deputies were
cleared of any wrongdoing.”  

            A reasonable jury
could infer that Sergeant Leija and the deputies acted under similar
instructions.  According to Thomas’s witness statement, Sergeant Leija, the
mental-health warrants division supervisor who was on duty when these events
occurred, arrived at Casey’s house even before emergency medical services.  She
immediately ordered the deputies to go to the hospital and find out if they
needed treatment for exposure to Casey’s hepatitis.  While paramedics attempted
to revive Casey—and before detectives from the Houston Police Department
arrived at the scene—the deputies drove away, thereby removing the vehicle and
any evidence it contained.  According to the written statements they prepared
the next day, Gehring and Young initially put Casey into their car while he was
merely handcuffed, and used additional restraints only after he tried to kick through
a window.  But according to Mrs. Nagel and the precinct’s own dispatch log, the
only time Casey was placed in the deputies’ vehicle was immediately before the
deputies noticed that he wasn’t breathing.[20]  Because the deputies had removed the vehicle from
the scene at Leija’s direction, the car was not examined for scratched windows,
scuffed doors, or other evidence of resistance to resolve the discrepancy.  

            After leaving the
scene, the deputies discussed the events that occurred at Casey’s home.  Gehring
called his lawyer; Young called his union representative;[21] and while they were still at the hospital, the
deputies had a group meeting with an attorney.  According to Cavitt, the
attorney told them “what we needed to be aware of before we filled out
statements.”  In several important respects, the dispatch log and the data
retrieved from the taser—both of which were created contemporaneously with the
events they record—contradict the deputies’ statements prepared the next day.[22]  

            Leija and another
officer, Sergeant Sigue, reviewed the deputies’ statements, and based on that
review, Sigue prepared a taser-use report.  One of the sergeants’ purposes in
preparing the report was “to be sure that all of the Constable’s policies and
procedures were being followed,” and as Leija agreed at trial, the deputies
“did just what they were supposed to do.”  In the report, Sigue identified the
number of taser cycles applied as “1” and denied there was a “need for an
additional shot” from the taser.  The report also called for an officer to
state whether an “authorized control hold” was applied, and Sigue responded in
the affirmative, but he identified the authorized control hold used as
“handcuffs.”  Leija testified that she reviewed the report for accuracy before
it was passed to the homicide detectives investigating Casey’s death, but if
the jury credited Thomas’s statement that Leija arrived at Casey’s home even
before the paramedics, then she would have been on the scene while Casey was
still hogtied.  She nevertheless maintained at trial that the report was
accurate even though leg restraints were not mentioned.  

            Although the length
of the leg restraints was vigorously disputed, the restraints themselves were
not preserved as evidence, but were returned to Gehring.  On the second day of
trial, it was reported that this evidence was missing.

            Finally, the evidence is uncontroverted that no
one involved in these events was disciplined—indeed, in the four years between
Casey’s death and this trial, Leija was promoted from sergeant to captain—and
Abercia has made no changes in policy regarding the use of force in executing
mental-health warrants.  Cf. Grandstaff v. City of Borger, 767
F.2d 161, 171–72 (5th Cir. 1985) (where unconstitutional use of deadly force
was followed by “little attention and action,” no discipline, and no policy
changes, jury was entitled to infer that the unconstitutional conduct
“demonstrated the policy of the [police force] as approved by its
policymaker”).  

            Considering this record in the light most
favorable to the jury’s verdict, we conclude that there was legally sufficient
evidence to support the ratification finding; thus, the trial court did not err
in denying the County’s motion for directed verdict, submitting the ratification
question, and entering judgment against the County.  We therefore overrule the
County’s third, fourth, and seventh issues.  

V.  Conclusion

            On this record,
the evidence is legally sufficient to support the jury’s findings against
deputies Gehring, Young, and Cavitt, and to support the conclusion that they
are not entitled to qualified immunity.  The evidence also is legally
sufficient to support the finding that the County, acting through Constable
Jack Abercia as the final policymaker in this area of the County’s business,
ratified the deputies’ excessive use of force.  We therefore affirm the
judgment without addressing the County’s remaining issues.

 

 

                                                                                    

                                                                        /s/        Tracy
Christopher

                                                                                    Justice

 

 

 

Panel consists of Justices
Seymore, Boyce, and Christopher.

 









[1] See infra, section
III.B.2.





[2] Green is not a doctor; he
is a pharmacy technician.





[3] On those occasions, Nagel
telephoned 911 and knew that police would respond.  This time, however, she
arranged for Casey’s transport through his doctor’s office, and expected a
mental-health team to escort him to the hospital.  Nagel further testified that
when she called the telephone number Green had given her, Sergeant Leija
answered the phone by saying, “Harris County Psychiatric Center” or “Harris
County Mental Health.”  Leija actually works for the Precinct One Constable’s
office in the mental-health warrants division.





[4] See La Grange
v. Nueces County, 989 S.W.2d 96, 103 & n.3 (Tex. App.—Corpus Christi
1999, pet. denied) (explaining that a four-point restraint applied to someone
who is lying face-down is known as a “hog-tie”); see also Webster’s Third New International Dictionary 1077 (Philip Babcock Gove ed., 3d ed.
1993) (“Hog-tie: to make (a thrown animal) helpless by tying the hind legs
together and then to one or both front legs with a short line <hog-tying
calves for branding>”).





[5] Spitz and Fisher’s Medicolegal Investigation of Death: Guidelines
for the Application of Pathology to Crime Investigation 833 (Werner U.
Spitz ed., 4th ed. 2006).





[6] This language was taken
directly from Graham v. Connor.  See Graham, 490 U.S. at 396, 109
S. Ct. at 1872 (“The ‘reasonableness’ of a particular use of force must be
judged from the perspective of a reasonable officer on the scene, rather than
with the 20/20 vision of hindsight.”); id. at 396–97, 109 S. Ct. at 1872
(“The calculus of reasonableness must embody allowance for the fact that police
officers are often forced to make split-second judgments—in circumstances that
are tense, uncertain, and rapidly evolving—about the amount of force that is
necessary in a particular situation.”); id. at 397, 109 S. Ct. at 1872
(“As in other Fourth Amendment contexts, however, the ‘reasonableness’ inquiry
in an excessive force case is an objective one: the question is whether the
officers’ actions are ‘objectively reasonable’ in light of the facts and
circumstances confronting them, without regard to their underlying intent or
motivation.”).





[7] See Anderson, 483
U.S. at 639, 107 S. Ct. at 3038 (“[W]hether an official protected by qualified
immunity may be held personally liable for an allegedly unlawful official
action generally turns on the ‘objective legal reasonableness’ of the action .
. . assessed in light of the legal rules that were ‘clearly established’ at the
time it was taken.” (quoting Harlow, 457 U.S. at 818, 819, 102 S. Ct. at
2738, 2739)).





[8] The quoted instructions
were drawn almost verbatim from the Fifth Circuit’s pattern jury instruction
for use in Fourth-Amendment excessive-force cases, and are similar to the
pattern jury instructions recommended nationally for use in such cases.  Compare
Fifth Circuit Pattern Jury Instructions
(Civil) No. 10.2 (2009) with Kevin
F. O’Malley et al., 3B Fed. Jury Prac. & Instr. § 165.23 (5th
ed. 2001).  The Fifth Circuit Court of Appeals not only encourages the use of
pattern jury instructions, see United States v. Tomblin, 46 F.3d 1369,
1380 n.16 (5th Cir. 1995), but for at least a decade has specifically approved
the submission of qualified immunity in the form of an instruction.  See,
e.g., Sikes v. Gaytan, 218 F.3d 491, 494 (5th Cir. 2000); see
also Meadours v. Ermel, No. 09-20150, 2011 WL 334679, at *2 (5th
Cir. Feb. 3, 2011) (per curiam) (holding that this language was an adequate
instruction to the jury that qualified immunity applies to actions that
violated the decedent’s constitutional rights if a reasonable officer could
believe, even mistakenly, that those actions were constitutional); Littrell
v. Franklin, 388 F.3d 578, 587 (8th Cir. 2004) (“Importantly, the Supreme
Court has not censured the Fifth Circuit’s practice.  This is true even though
there exists a split among the circuits as to the proper apportionment of
responsibility between juries and judges in this context.”); Rigdon Marine
Corp. v. Roberts, 270 S.W.3d 220, 230 (Tex. App.—Texarkana 2008, pet.
denied) (finding no abuse of discretion where the trial court relied on a Fifth
Circuit pattern jury instruction in charging the jury on federal law).  





[9] The defendants’ attorney
stated that they were tendering a proposed question on qualified immunity, but
it is not in the record.  The trial court stated on the record that the
proposed question “in effect says: Do you find that no reasonable officer who
knew the clearly established law on February 18, 2005, and the circumstances
surrounding the use of force against Joel Casey by the officers could have believed
that this use of force was lawful?”





[10] The instruction is
framed in terms of objective reasonableness, but the jury was asked whether the
deputies’ conduct was objectively unreasonable.  The parties do not complain of
this difference.





[11] There is no evidence
that any of the deputies was a member of that organization.





[12] We do not imply that a
different standard applies when deadly force is used.  Regardless of the type
or extent of force used, courts reviewing excessive-force cases under the
Fourth Amendment focus on whether the officers’ conduct was objectively
reasonable.  See Scott v. Harris, 550 U.S. 372, 382, 127 S. Ct. 1769,
1777, 167 L. Ed. 2d 686 (2007).  





[13] Texas state courts use
the term ratification in such exemplary-damages cases in the same way
that the United States Supreme Court used the term in Praprotnik: in
both, a principal ratifies its agent’s act if the principal knows how and why
the agent acted and approves.  Compare Praprotnik, 485 U.S. at
127, 108 S. Ct. at 926 (explaining that governmental liability can arise from 
ratification when “the authorized policymakers approve a subordinate’s decision
and the basis for it”) with Restatement
of Torts § 909 (1939), cmt. a (“[A] person on whose account another
has acted should be responsible for an outrageous act where otherwise he would
not be if, with full knowledge of the act and the way in which it was done, he
ratifies it . . . .”) and King v. McGuff, 149 Tex.
432, 434–35, 234 S.W.2d 403, 405 (1950) (holding, under the common-law
predecessor to Texas Civil Practice and Remedies Code section 41.005, that
section 909 of the Restatement of Torts expresses Texas’s prevailing rule
governing a principal’s liability for punitive damages based on the agent’s
wrongdoing).





[14] Unlike the issue of
qualified immunity, there is no pattern jury charge in the Fifth Circuit for
governmental liability based on ratification.  But see Third Circuit Model Jury Instructions (Civil),
No. 4.6.5, cmt. (2010) (explaining that a policymaker’s agreement with a
subordinate’s decision to violate another’s constitutional rights can occur
after the violation has occurred); Manual
of Model Civil Jury Instructions for the
District Courts of the Ninth Circuit, Instruction No. 11.3.1 (1997)
(defining “official policy” to include “an act or omission ratified by the
[County’s] lawmaking officer or policy-making official”).





[15] The instructions in this
question refer to the policymaker of the constable’s office rather than the
policymaker of the County, but another instruction informed the jury that the
County was liable if a Precinct One policy was “the moving force of an injury”
to Casey.  In effect, the jury was told that the policies of the Precinct One
Constable’s office were the County’s policies.  And, as explained in the next
section, it is correct that Abercia is the County’s final policymaker as to the
way in which mental-health warrants are executed.  





[16] This is similar to the
County’s argument in the trial court, discussed at III.B.1, supra, that
the state of the clearly established law is a question of fact on which the
plaintiff is not allowed to present evidence.  





[17] See 1925 Tex. Rev. Civ. Stat. art. 3993, repealed
by Act of May 12, 1939, 46th Leg., R.S., ch. 25, § 1, 1939 Tex. Gen.
Laws 201, 201 (current version at Tex.
R. Civ. P. 755); see also Tex.
R. Civ. P. 749a, cmt. to 1990 amendment, 53 Tex. B.J. 1033, 1035 (1990) (“The term writ of restitution is
corrected to writ of possession.”).  





[18] County of Dallas v.
Wiland, 216 S.W.3d 344, 347–48 (Tex. 2007); Gillis v. Wooten, No.
14-03-01134-CV, 2004 WL 1406299, at *4 (Tex. App.—Houston [14th Dist.] June 24,
2004, no pet.) (mem. op.) (affirming summary judgment against former Harris
County deputy constable in his wrongful-termination suit against the constable
and the county on the ground that deputy was an at-will employee).





[19] Abercia further
confirmed at trial that the county commissioners court appropriated funds for
the Harris County Precinct One Constable’s office to serve all of the
mental-health warrants in the county; that he has the right to change anything
in his department; and that he is the “ultimate policymaker,” the “head
policymaker,” the “head man,” and “the buck stops with [him].”  As Abercia phrased
it, “I’ve got the last say-so . . . .”





[20] According to the
dispatch log, there were a series of five transmissions at 4:48 p.m.  These
included “pt still fighting”; “all units priority one”; “advise slow down units
subject in vehicle”; and “pt in vehicle under control.”  At 4:49 p.m., one of
the deputies radioed, “request EMS subject not breathing/unresponsive . . . .” 






[21] Gehring and Young each
may be referring to a single attorney retained by their union.





[22] According to the
dispatch log, Deputy E.G. Lopez arrived on the scene at 4:50 p.m., and at 4:59
p.m., Lopez radioed “taser darts deployed/uneffective on the scene.”  Thus, the
Constable’s office was not notified that a taser had been used until advised by
an officer who arrived on the scene after Casey’s death.  Young wrote in his
statement that he used the taser twice, but he initially testified at trial
that he used the taser once.